**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

LESLIE SARGENT )
and JOHN TOLER )
on behalf of Plaintiffs and the class )
members described herein, )
 )
        Plaintiffs, )
 )
v. )
 )    1:24-cv-02226
 )
BISON LENDING, doing business as )
BUFFALO LAKE LENDING; )
VELOCITY VENTURES GROUP, )
LLC doing business as INFINITY )
ENTERPRISE LENDING SYSTEMS; )    DEMAND FOR TRIAL BY JURY
and JOHN DOES 1-20; )
 )
        Defendants. )

## COMPLAINT – CLASS ACTION

1.    Plaintiffs Leslie Sargent and John Toler bring this action against Defendants (a) Bison Lending, doing business as Buffalo Lake Lending; (b) Velocity Ventures Group, LLC, doing business as Infinity Enterprise Lending Systems; and (c) John Does 1-20 to secure redress for usurious and illegal loans (such as Exhibits A-B) made to Indiana residents.

2.    The loans are made in the name of Bison Lending, d/b/a Buffalo Lake Lending, via the website www.buffalolakelending.com. Velocity Ventures Group, LLC doing business as Infinity Enterprise Lending Systems ("Infinity"), and John Does 1-20 are involved in the making of the loans.

3.    Plaintiff Leslie Sargent seeks damages under the Indiana Consumer Credit Code (Count I). Both Plaintiffs seek treble damages under the Racketeer Influenced and Corrupt Organizations Act (RICO). 18 U.S.C. §1964 (Counts II-III).

## JURISDICTION AND VENUE

4.    The Court has subject matter jurisdiction under 28 U.S.C. §1331 (general federal question), 18 U.S.C. §1964 (RICO), and 28 U.S.C. §1337 (interstate commerce). Jurisdiction may

-1-

also exist under 28 U.S.C. §1332(d).

5.  This Court has personal jurisdiction over Defendants because they:

a.  Knowingly participated in the making and collection of unlawful loans to Indiana residents. In similar actions against purported "tribal" lenders, courts have held that personal jurisdiction over the persons involved in making the loans exists in the state where the borrower obtained a loan via the Internet, and in which loan funds were disbursed via ACH transfer. *Gingras v. Rosette*, 5:15cv101, 2016 U.S. Dist. LEXIS 66833, 2016 WL 2932163, at *2-3, *9 (D. Vt. May 18, 2016)*, aff'd sub nom. Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019) (finding that tribal lending entity's contacts with Vermont "would have been sufficient to subject [the tribal entity] to personal jurisdiction in Vermont" for purposes of claims for violations of state and federal law, including state usury laws and RICO, where tribal entity operated a website that advertised loans in Vermont, sent emails and loan applications to Vermont consumers and transferred loan principal to consumers' Vermont bank accounts); *Duggan v. Martorello*, 18cv12277, 2022 U.S. Dist. LEXIS 58075, at *33-34, 2022 WL 952183 (D. Mass. Mar. 30, 2022); *Dawkins v. Blue Dart Ventures*, 8:20cv2353, 2021 U.S. Dist. LEXIS 130297 (M.D. Fla. Apr. 1, 2021).

b.  Selected which states to offer loans in, thereby targeting those states. *Illinois v. Hemi Group, LLC*, 622 F.3d 754, 760 (7th Cir. 2010).

6.  Venue is proper because acts to obtain and collect the loans impacted Plaintiff in Indiana.

7.  Article III is satisfied because actions for statutory damages and invalidation of loans for usury were entertained by the courts of England and the United States in 1787. English Usury Act of 1713, 12 Anne Session 2 c. 17. All thirteen original American states replaced the English

usury statutes with their own usury laws between 1641 and 1791. Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minnesota Law Review 1110, 1116-18 (April 2008), summarizing statutes allowing 5% to 8% interest.

## PARTIES

### Plaintiff

8.      Plaintiff Leslie Sargent is a citizen of Indiana residing in Camby, Indiana.

9.      Plaintiff John Toler is a citizen of Indiana residing in Whiteland, Indiana.

### Defendants

10.      Defendant Bison Lending, doing business as Buffalo Lake Lending ("Buffalo Lake Lending") purports to be an entity chartered pursuant to the laws of the Crow Creek Sioux Tribe, a federally recognized Indian Tribe (the "Tribe"). Buffalo Lake Lending issues loans to consumers over the Internet through the website www.buffalolakelending.com. (Exhibit C). Buffalo Lake Lending uses the address P.O. Box 254, Ft. Thompson, SD 57339. It may be served at 100 Drifting Goose Way, Ft. Thompson, SD 57345.

11.      Defendant  Infinity is a limited liability company organized under Florida law which operates at 4864 Sparks Blvd., Sparks, NV 89436. Its registered agent and office is Corporate Creations Network Inc., 8275 South Eastern Avenue, #200, Las Vegas, NV 89123.

12.      Defendants John Does 1-20 are other persons and entities involved in the lending activities complained of herein.

## FACTS RELATING TO PLAINTIFFS

13.      On or about February 5, 2024, Buffalo Lake Lending made a $425 loan to Plaintiff Leslie Sargent at a stated annual percentage rate of 593.38%.  (Exhibit A)

14.      On or about June 14, 2022, Buffalo Lake Lending made a $566.24 loan to Plaintiff John Toler at a stated annual percentage rate of 592.94%.  (Exhibit B)

15.      Plaintiffs made payments on the loans.

16. Plaintiffs obtained the loans for personal, family, or household purposes and not for business purposes.

17. Buffalo Lake Lending disbursed the loan proceeds via ACH into Plaintiffs' respective bank accounts in Indiana.

18. The loans were to be repaid via ACH debits from Plaintiffs' respective bank accounts in Indiana.

19. At no time did Plaintiffs set foot on Tribal lands.

20. Plaintiffs obtained the loans via the Internet from Indiana.

21. Buffalo Lake Lending regularly made loans to individuals in Indiana at such rates. On information and belief, it made over 100 such loans.

22. Exhibits A-B are standard form documents.

23. The Buffalo Lake Lending website lists states in which Defendants will not make loans. Indiana is not one of these states.

24. Defendants sought out Indiana residents for such loans.

25. The loans were disbursed via ACH credits to the borrowers' Indiana bank accounts.

26. The loans were collected via ACH debits from the borrowers' Indiana bank accounts.

27. Buffalo Lake Lending does business in Indiana over the Internet, via text message, via Automated Clearing House transactions, and over the telephone.

28. On information and belief, vast majority of the economic benefit of the activities of Buffalo Lake Lending is received by non-Native American persons.

29. On information and belief, the actual lending operations were carried out and continue to be carried out in locations other than tribal lands. The operations that are not conducted on tribal land include lead generation, marketing, funding, underwriting, payment processing, and collection.

30. A significant majority of the transaction occurs within the State of Indiana –

applying for the loan and receiving and collecting the funds.

31.    The place where a consumer is located when he or she submits an application via an online portal with a Native American tribe determines where the transaction takes place for jurisdictional purposes. *California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 968 (9th Cir. 2018) ("However, the patrons' act of placing a bet or wager on a game of DRB while located in California constitutes gaming activity that is not located on Indian lands, violates the UIGEA, and is not protected by IGRA.").

32.    Defendants John Does 1-20 are other natural and artificial persons involved in the lending activities described herein.

33.    Loans to Indiana residents made in the same manner as the loan to Plaintiff are governed by the laws of the State of Indiana.

## INVOLVEMENT OF OTHER DEFENDANTS IN LOANS

34.    While Buffalo Lake Lending is purportedly owned by the Tribe, in reality, the Tribe has virtually nothing to do with the operation of the lending business and simply participates in what is often referred to as a "rent-a-tribe" scheme.

35.    In a "rent-a-tribe" scheme, non-tribal payday lenders attempt to circumvent state usury laws by invoking the sovereign immunity available to Native American tribes.

36.    While the non-tribal entities operate all substantive aspects of the business such as funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections for the high-interest loans, the tribe acts as a label or figurehead in exchange for what is often a relatively insignificant portion of the revenue generated.

37.     In need of money, the Crow Creek Sioux Tribe attempted to rent out its sovereign immunity to non-tribal persons and entities who agreed to pay the Tribe a small percentage of each loan as a fee or commission.

38.    The Tribe became a supplier in the rental market for sovereign immunity, making "rent-a-tribe" agreements with various investors.

39.    In addition to Buffalo Lake Lending, at least the following Internet lenders have purported to operate as arms of the Crow Creek Sioux Tribe:

a.    Wahido Lending, d/b/a River Valley Loans;

b.    Basswood Lending, d/b/a "Level Up Funding";

c.    Koda Lending, d/b/a Helpful Lending;

d.    Dakota Lending, d/b/a MyLoanSite; and

e.    Inazin Lending, d/b/a Rise Up Lending.

40.    On information and belief, the Tribe received less than five percent of revenues from the lenders in exchange for the use of its name.

41.    Loan approval was made by the non-tribal owners of the lender.

42.    Loans are funded from bank accounts to which the Tribe has no access, and the loans are serviced and collected by nontribal entities off the Tribe's reservation.

43.    The essential business operations necessary to make the Buffalo Lake Lending loans are actually performed in other locations outside of the Tribe's jurisdiction, by and for the benefit of non-tribal investors.

44.    These operations include incoming and outgoing phone calls and emails, review of loan applications, loan underwriting, payment processing, website maintenance and marketing.

45.    Infinity is a "back-end" services vendor that provides software to analyze, underwrite, service, and collect high-interest loans.

46.    Infinity states that its software "can support your vision… and your success. We have built the industry's best solution for Payday loan management. *See* https://www.fintechfinance.io/about-us.  "Our Business Rules Engine will meet your exact lending model and grow along  with you. Schedule ACH transactions and reminder messages for automatic payment processes. Follow-up reminders will keep your CSR's on-task when working customer accounts. Refinancing a loan is as easy as clicking a button. Infinity is built to manage your Payday loan product no matter where you are  lending."

47.    Payday Loan Manager is software for operating a payday lending website, including "an integrated ACH provider that automatically handles the crediting and debiting of your loans."

48.    Infinity's website, infinitysoftware.com, as well as paydayloanmanager.com, are hosted on servers owned or managed by Infinity, with an IP address of 169.55.60.156. (Exhibit D)

49.    More than 100 different payday lending websites are hosted by Infinity on the same server, many of which claim sham "tribal" affiliations.

50.    Infinity's website even features testimonials from non-tribal  individuals who are, nonetheless, listed as owners or executives of ostensibly "tribal" payday lenders.

51.    One such testimonial is from Dustin A. Dernier ("Dernier"), who is identified as "CEO 605 Lending." (Exhibit E)

52.    Dernier states, "The Infinity Team has helped us grow our start up into something to be very proud of. The entire team has been there for us every  step of the way." (Emphasis added.) *Id.*

53.    Another testimonial is from John Humphrey ("Humphrey"),  identified as "COO DMP Investments." (Exhibit F)

54.    DMP Investments LLC is owned by the Texas payday loan magnate William C. Pruett ("Pruett"), who operates numerous payday lending businesses, including several operated under a "rent-a-tribe" model, including Sky Trail Cash, supposedly owned by the Lac du Flambeau Tribe in rural Wisconsin. It makes loans to consumers in many states at triple-digit rates.

55.    Humphrey states: "Your software platform provided the ideal mix of processing capacity, high availability, and resource scalability that each proved vital components throughout our implementation. We sincerely appreciate the relationship with our friends at Infinity Software and consider their software platform an indispensable resource in operational landscape." *Id.*

56.    Infinity's website features a video touting how its software features "end-to-end loan process automation" and can "automate the loan collection process for maximum results."

57.    Infinity thus provides and manages the software which underwrites and collects

Buffalo Lake Lending loans, including the loan to Plaintiffs, and also manages the ACH transactions involving Plaintiff's bank accounts in Indiana. The software was stored and ran on servers belonging to Infinity.

58.    Infinity received a portion of the profits from the Buffalo Lake Lending loans.

59.    Infinity provides such services to multiple Internet lenders.

60.    Other Defendants involved in the lending activities are named as John Does 1-20.

### INDIANA REGULATION OF LENDING

61.    The Indiana Uniform Consumer Credit Code establishes a maximum loan finance charge of 36% per annum for consumer loans.

62.    With respect to loans other than supervised loans, Ind. Code § 24-4.5-3-201, provides:

> (1) Except as provided in subsections (7) and (9), with respect to a consumer loan, other than a supervised loan (as defined in section 501 [IC 24-4.5-3-501] of this chapter), a lender may contract for a loan finance charge, calculated according to the actuarial method, not exceeding twenty-five percent (25%) per year on the unpaid balances of the principal (as defined in section 107(3) [IC 24-4.5-3-107(3)] of this chapter). . . .

63.    With respect to supervised loans, the Indiana Uniform Consumer Credit Code, Ind. Code § 24-4.5-3-508, provides:

> Loan finance charge for supervised loans.

> (1) With respect to a supervised loan, including a loan pursuant to a revolving loan account, a supervised lender may contract for and receive a loan finance charge not exceeding that permitted by this section.

> (2) The loan finance charge, calculated according to the actuarial method, may not exceed the equivalent of the greater of:

> > (a) the total of:

> > > (I) thirty-six percent (36%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) [IC 24-4.5-3-107(3)] of this chapter) which is two thousand dollars ($2,000) or less;

> > > (ii) twenty-one percent (21%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) of this chapter) which is more than two thousand dollars ($2,000) but does not exceed four thousand dollars ($4,000); and

(iii) fifteen percent (15%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) of this chapter) which is more than four thousand dollars ($4,000); or

(b) twenty-five percent (25%) per year on the unpaid balances of the principal (as defined in section 107(3) of this chapter). . . .

64.     There is also a provision for small loans, Ind. Code § 24-4.5-7-101 *et seq.*, but it does not authorize Defendants' rates, and requires that small loans conform to other requirements that Defendants' loans do not comply with.

65.     Ind. Code. § 24-4.5-7-201, "Limitations on finance charges," provides:

(1) Finance charges on the first two hundred fifty dollars ($250) of a small loan are limited to fifteen percent (15%) of the principal.

(2) Finance charges on the amount of a small loan greater than two hundred fifty dollars ($250) and less than or equal to four hundred dollars ($400) are limited to thirteen percent (13%) of the amount over two hundred fifty dollars ($250) and less than or equal to four hundred dollars ($400).

(3) Finance charges on the amount of the small loan greater than four hundred dollars ($400) and less than or equal to five hundred fifty dollars ($550) are limited to ten percent (10%) of the amount over four hundred dollars ($400) and less than or equal to five hundred fifty dollars ($550).

(4) The amount of five hundred fifty dollars ($550) in subsection (3) is subject to change under the provisions on adjustment of dollar amounts (IC 24-4.5-1-106). However, notwithstanding IC 24-4.5-1-106(1), the Reference Base Index to be used under this subsection is the Index for October 2006.

66.     The amount of finance charge provided for in <u>Exhibit A and B</u> are more than double that permitted in Indiana under any provision.

67.     Ind. Code § 24-4.5-1-201, "Territorial application," provides:

(1) Except as otherwise provided in this section, this article applies to sales, leases, and loans made in this state and to modifications, including refinancings, consolidations, and deferrals, made in this state, of sales, leases, and loans, wherever made. For purposes of this article, the following apply: . . .

(c) A loan or modification of a loan agreement is made in this state if a writing signed by the debtor and evidencing the debt is received by the lender or a person acting on behalf of the lender in this state.

(d) Except as provided in subdivisions (e) and (f), a sale, lease, or loan transaction occurs in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction with a creditor or a person acting on behalf of the

-9-

creditor in another state and the creditor or the person acting on behalf of the creditor has advertised or solicited sales, leases, or loans in Indiana by any means, including by mail, brochure, telephone, print, radio, television, the Internet, or electronic means.

(e) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction secured by an interest in land located outside Indiana.

(f) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction at a creditor's place of business in another state.

For purposes of subdivisions (a) through (c), an offer is received by a creditor or a person acting on behalf of the creditor in Indiana if the offer is physically delivered, or otherwise transmitted or communicated, to a person who has actual or apparent authority to act for the creditor or the person acting on behalf of the creditor in Indiana, regardless of whether approval, acceptance, or ratification by any other agent or representative of the creditor or the person acting on behalf of the creditor in another state is necessary to give legal consequence to the consumer credit transaction. . . .

(5) Notwithstanding other provisions of this section:

(a) except as provided in subsection (2), this article does not apply if the buyer, lessee, or debtor is not a resident of this state at the time of a credit transaction and the parties then agree that the law of the buyer's, lessee's, or debtor's residence applies; and

(b) this article applies if the buyer, lessee, or debtor is a resident of this state at the time of a credit transaction and the parties then agree that the law of this state applies.

(6) Except as provided in subsection (5), the following agreements by a buyer, lessee, or debtor are invalid with respect to consumer credit sales, consumer leases, consumer loans, or modifications thereof, to which this article applies:

(a) An agreement that the law of another state shall apply.

(b) An agreement that the buyer, lessee, or debtor consents to the jurisdiction of another state.

(c) An agreement that fixes venue. . . .

(8) If a creditor or a person acting on behalf of the creditor has violated the provisions of this article that apply to the authority to make consumer loans (IC 24.4.5-3-502), the loan is void and the debtor is not obligated to pay either the principal or loan finance charge, as set forth in IC 24.4.5-5-202.

68.    Ind. Code § 24.4.5-5-202, "Effect of violations on rights of parties," provides:

. . .  (3) A debtor is not obligated to pay a charge in excess of that allowed by this Article, and **_if the debtor has paid an excess charge the debtor has a right to a refund_**. A refund may

be made by reducing the debtor's obligation by the amount of the excess charge. If the debtor has paid an amount in excess of the lawful obligation under the agreement, the debtor may recover the excess amount from the person who made the excess charge or from an assignee of that person's rights who undertakes direct collection of payments from or enforcement of rights against debtors arising from the debt.

(4) **If a debtor is entitled to a refund and a person liable to the debtor refuses to make a refund within a reasonable time after demand, the debtor may recover from that person a penalty in an amount determined by a court not exceeding the greater of either the amount of the credit service or loan finance charge or ten (10) times the amount of the excess charge. If the creditor has made an excess charge in deliberate violation of or in reckless disregard for this Article, the penalty may be recovered even though the creditor has refunded the excess charge.** No penalty pursuant to this subsection may be recovered if a court has ordered a similar penalty assessed against the same person in a civil action by the department (IC 24-4.5-6-113). With respect to excess charges arising from sales made pursuant to revolving charge accounts or from loans made pursuant to revolving loan accounts, no action pursuant to this subsection may be brought more than two (2) years after the time the excess charge was made. With respect to excess charges arising from other consumer credit sales or consumer loans, no action pursuant to this subsection may be brought more than one (1) year after the due date of the last scheduled payment of the agreement pursuant to which the charge was made. . . .

(7) If the creditor establishes by a preponderance of evidence that a violation is unintentional or the result of a bona fide error, no liability is imposed under subsections (1), (2), and (4) and the validity of the transaction is not affected.

(8) In any case in which it is found that a creditor has violated this Article, the court may award **reasonable attorney's fees** incurred by the debtor. . . . (Emphasis added)

## RENT-A-TRIBE SCHEMES

69.    In an attempt to evade prosecution under usury laws of states like Indiana, non-tribal owners of online payday lending businesses frequently engage in a business model commonly referred to as a "rent-a-tribe" scheme.

70.    Here, and in such schemes, non-tribal payday lenders create an elaborate charade claiming their non-tribal businesses are owned and operated by Native American tribes.

71.    The illegal payday loans are then made in the name of a Native American tribal business entity which purport to be shielded from state and federal laws prohibiting usury due to tribal sovereign immunity. However, the tribal lending entity is simply a facade for an illegal lending scheme; all substantive aspects of the payday lending operation–funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections—are performed by

individuals and entities that are unaffiliated with the tribe.

72.     In exchange for use of the tribe's name, the beneficial owner of the payday lending scheme pays the cooperating tribe a fraction of the revenues generated. While the percentage varies from scheme-to-scheme, the number is almost always in the single digits.

73.     However, an entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

74.     To determine if a particular entity is entitled to sovereign immunity, the majority of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough* at 1183, 1187-88.

75.     These so-called "tribal lenders" usually do not survive scrutiny when examined closely, since virtually all business functions occur far from tribal land, by non-tribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

76.     Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes and, therefore, are not shielded by sovereign immunity.

77.     Further, sovereign immunity, even if legitimately invoked, still does not turn an otherwise illegal loan into a legal one. *See, e.g., United States v. Neff*, 787 F. App'x 81 (3d Cir. 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

-12-

78.     Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on 14 felony counts for their operation of a network of tribal lending companies. *See United States v. Tucker, et al.*, No. 1:16-cr-00091-PKC (S.D.N.Y). The conviction was affirmed in *United States v. Grote*, 961 F.3d 105 (2d Cir. 2020).

79.     The excessive interest charges imposed by Defendants were intentional.

## COUNT I – INDIANA UNIFORM CONSUMER CREDIT CODE

80.     Plaintiff Leslie Sargent  incorporates paragraphs 1-79.

81.     Because the loans made to Plaintiff violated the rate limits set by Indiana law, and the violation was intentional, Plaintiff and other borrowers are entitled to ten (10) times the amount of the excess charges.

## CLASS ALLEGATIONS

82.     Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

83.     The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made in the name of Buffalo Lake Lending at more than 36% interest (all of its loans qualify) (c) on or after a date two years prior to the filing of this action.

84.     Plaintiff may alter the class definition to conform to developments in the case and discovery.

85.     The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

86.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect

illegal loans.

87.     Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

88.     Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

89.     A class action is superior for the fair and efficient adjudication of this matter, in that:

      a.     Individual actions are not economically feasible; and

      b.     Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

      i.     Statutory damages;

      ii.     Attorneys' fees, expenses and costs; and

      iii.     Such other or further relief as is appropriate.

## COUNT II – RICO

90.     Plaintiffs incorporate paragraphs 1-79.

91.     This claim is against Infinity and the Does, who are the RICO "persons."

92.     All loans made in the name of Buffalo Lake Lending to Indiana residents are (a) unenforceable under Indiana law in whole or in part as to principal or interest because of the laws relating to usury, and (b) were incurred in connection with the business of lending money at a rate usurious under Indiana law, where (c) the usurious rate is at least twice the enforceable rate (36%).

93.     The loans are therefore "unlawful debts" as defined in 18 U.S.C. § 1961(6).

94.     Buffalo Lake Lending is an enterprise affecting interstate commerce, in that it is located outside of Indiana and makes loans to Indiana residents via the Internet.

95.     Defendants Infinity and the Does are associated with this enterprise, in that they operate it.

96.     Defendant Infinity and the Does conducted or participated in the conduct of the

affairs of Buffalo Lake Lending through a pattern of collection of unlawful debt, as set forth above, in violation of 18 U.S.C. § 1962(c).

97.     Plaintiffs were deprived of money as a result.

## CLASS ALLEGATIONS

98.     Plaintiffs bring this claim on behalf of a class.

99.     The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made in the name of Buffalo Lake Lending at more than 72% interest (all of its loans qualify) (c) which loan was made on or after a date 4 years prior to the filing of suit.

100.    The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

101.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

      a.     Whether the loans at issue are "unlawful debts" as defined in RICO;

      b.     Whether Buffalo Lake Lending is an "enterprise;"

      c.     Whether Defendant Infinity is associated with Buffalo Lake Lending;

      d.     Whether the Does are associated with Buffalo Lake Lending; and

      e.     Whether Defendants Infinity and the Does each conducted or participated in the affairs of Buffalo Lake Lending through a pattern of making and collecting unlawful loans.

102.    Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer credit litigation.

103.    Plaintiffs' claim is typical of the claims of the class members. All are based on the same factual and legal theories.

104.    A class action is superior for the fair and efficient adjudication of this matter, in that:

a.    Individual actions are not economically feasible; and

b.    Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and the class and against Defendants for:

i.    Treble damages;

ii.    Attorney's fees, litigation expenses and costs of suit; and

iii.    Such other or further relief as the Court deems proper.

## COUNT III – RICO

105.    Plaintiffs incorporate paragraphs 1-79.

106.    This claim is against Infinity and John Does 1-20, who are the RICO "persons."

107.    All loans made via www.buffalolakelending.com to Indiana residents are (a) unenforceable under Indiana law in whole or in part as to principal or interest because of the laws relating to usury, and (b) were incurred in connection with the business of lending money at a rate usurious under Indiana law, where (c) the usurious rate is at least twice the enforceable rate (36%).

108.    The loans are therefore "unlawful debts" as defined in 18 U.S.C. §1961(6).

109.    Buffalo Lake Lending affects interstate commerce, in that it has physical locations outside of Indiana and makes loans to Indiana residents via the Internet.

110.    Defendants agreed and conspired to operate Buffalo Lake Lending as a business engaging in lending money at more than twice the lawful rate in Indiana, in violation of 18 U.S.C. §1962(d), and did in fact so operate it.

111.    Plaintiffs were deprived of money as a result.

## CLASS ALLEGATIONS

112.    Plaintiffs bring this claim on behalf of a class.

113.    The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made via www.buffalolakelending.com at more than 36% interest (c) which loan was made on or after a date four years prior to the filing of this action.

-16-

114.    The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

115.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

    a.    Whether the loans at issue are "unlawful debts" as defined in RICO;

    b.    Whether Defendants agreed and conspired to operate Buffalo Lake Lending as a business engaged in the making and collection of loans at more than twice the lawful rate in Illinois; and

    c.    Whether Defendants carried out their agreement.

116.    Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer credit litigation.

117.    Plaintiffs' claim is typical of the claims of the class members. All are based on the same factual and legal theories.

118.    A class action is superior for the fair and efficient adjudication of this matter, in that:

    a.    Individual actions are not economically feasible.

    b.    Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and the class and against Defendants for:

    i.    Treble damages;

    ii.    Attorneys' fees, litigation expenses and costs of suit; and

    iii.    Such other or further relief as the Court deems proper.


*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman (IL ARDC 0712094)
Heather Kolbus (IL ARDC 6278239 )
Alexandra Huzyk (IL ARDC 6349537)
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1800-1841
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service:  courtecl@edcombs.com

## **JURY DEMAND**

Plaintiffs demand trial by jury.

_/s/ Daniel A. Edelman_
Daniel A. Edelman

## <u>EXHIBITS</u>

A        Plaintiff Leslie Sargent's loan

B        Plaintiff John Toler's loan

C        www.buffalolakelending.com

D        Server Location of IP Address 169.55.60.156

E        Dustin Dernier Infinity Testimonial

F        John Humphrey Infinity Testimonial

## <u>NOTICE OF ASSIGNMENT</u>

Please be advised that all rights relating to attorney's fees have been assigned to counsel.


*/s/ Daniel A. Edelman*
Daniel A. Edelman

## <u>DOCUMENT PRESERVATION DEMAND</u>

Plaintiffs hereby demand that each Defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to Plaintiffs, class members, the events described herein, any third party associated with any telephone call, campaign, account, sale or file associated with Plaintiffs, and any account or number or symbol relating to them. These materials are likely very relevant to the litigation of these claims. If any Defendant is aware of any third party that has possession, custody, or control of any such materials, Plaintiffs demand that such Defendant request that the third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of each Defendant.

*/s/ Daniel A. Edelman*
Daniel A. Edelman